# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DANIEL P. ARAGON,

              Plaintiff,

          v.

REX TILLERSON, in his official capacity as
Secretary of State, *et al.*,

              Defendants.

Civil Action No. 16-129 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Daniel Aragon, served as an entry-level Foreign Service Officer with the

U.S. Department of State for five years, until he was denied tenure and involuntarily separated in

2014.  The reason for the tenure denial arose during the plaintiff's second overseas assignment,

when the plaintiff was responsible for supervising an employee, whose undisputed pattern of

insubordination, tardiness, abuse of leave policies and performance issues would, in many work

environments, warrant termination of employment.  Instead, the plaintiff's management efforts,

which were ultimately successful, to bring this employee into compliance with basic workplace

rules, has led to the plaintiff's own termination from a job he "love[s]."  AR at 354.[1]

The plaintiff filed the instant action against the Secretary of State, in the Secretary's

official capacity, after the State Department denied his grievance contesting the performance

evaluations on which the tenure denial was predicated, and the Foreign Service Grievance Board

("FSGB") upheld the State Department's decision.[2]  Alleging that the FSGB's decision was

---

[1]      The facts in this Memorandum Opinion are drawn from the 315-page administrative record.  *See generally*
Admin. Record ("AR"), ECF No. 18.
[2]      Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the current
Secretary of State, Rex Tillerson, for former Secretary John Kerry.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the plaintiff seeks, *inter alia*, an order directing the State Department to remove from his personnel file the two performance evaluations on which the denial of tenure was predicated, Compl., Relief ¶ 3, ECF No. 1; an order rescinding the tenure decisions predicated on those evaluations, *id.*; an order directing the State Department to reinstate the plaintiff retroactively, with back pay and benefits, *id.* ¶ 4; and an order directing the State Department to place the plaintiff in the same promotional class he would be in had he received tenure in the winter of 2013, *id.* ¶ 5.  Pending before the Court are the plaintiff's motion for summary judgment, *see generally* Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 12, and the Secretary's cross-motion for summary judgment, *see generally* Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 14.  For the reasons set out below, the plaintiff's motion for summary judgment is granted in part and denied in part, without prejudice, the Secretary's cross-motion for summary judgment is denied without prejudice, and this action is remanded to the FSGB for further proceedings.

## I.      BACKGROUND

This suit arises out of the plaintiff's denial of tenure by the State Department.  The regulatory scheme governing Foreign Service tenure decisions is described below, followed by a summary of the particular facts underlying the plaintiff's case.

### A.      Obtaining Tenure in the Foreign Service

Entry-level Foreign Service career candidates are assigned upon hire to one of a variety of skill codes, referred to as "cones."  Career candidates are subject to a five-year limited appointment that requires achievement of tenure within that period or mandatory separation from the Service.  *See* 3 Foreign Affairs Manual ("FAM") §§ 2241.3(1), 2245.1.  The decision

whether to grant or deny tenure lies with the Commissioning and Tenure Board ("CTB"). *Id.*

§ 2245.1. "The sole criterion for a positive tenuring decision [is] the candidate's demonstrated

potential, assuming normal growth and career development, to serve effectively as a Foreign

Service Officer over a normal career span, extending to and including class FS-01." *Id.* The

CTB "makes its initial judgment regarding an entry-level officer candidate's potential as soon as

possible after a candidate has served 36 months." *Id.* § 2245.2. Candidates not recommended

for tenure receive a second review 12 months after the initial review. *Id.* The CTB "may

recommend a third review six months subsequent to the second review, if it

considers that additional evaluated experience may lead to a favorable tenuring decision." *Id.*

(emphasis omitted).

In issuing tenure decisions, the CTB relies on a candidate's performance appraisals,

referred to as Employee Evaluation Reports ("EERs"), *id.* § 2243.1, which are completed by a

rating officer and a reviewing officer at specified intervals. *See id.* § 2243.2. The rater and

reviewer provide feedback in the EER and check one of four boxes concerning a tenure

candidate's performance: (1) "[u]nable to assess potential from observations to date;"

(2) "[c]andidate is unlikely to serve effectively even with additional experience;"

(3) "[c]andidate is likely to serve effectively but judgment is contingent on additional evaluated

experience;" or (4) "[c]andidate is recommended for tenure and can be expected to serve

successfully across a normal career span." AR at 35.

### B.     The Plaintiff's Denial of Tenure

The plaintiff was reviewed for tenure by the CTB three times—once following his tour in

Rio de Janeiro, and twice while serving in Dubai.

### 1.      First Tenure Review

The plaintiff joined the Foreign Service as an entry-level career candidate on March 1, 2009.  *Id.* at 8.  Although he was placed in the Public Diplomacy cone, the plaintiff's first assignment, from July 21, 2009, through July 25, 2011, was in another skill area, to serve as a Consular Officer at the U.S. Consulate General in Rio de Janeiro, Brazil.  *Id.*  While there, the plaintiff received three EERs.  The first two EERs, issued in July 2010 and February 2011, "praised [the plaintiff] for being 'hard-working.'"  *Id.* at 310.  At the same time, however, the 2010 EER expressed concern that the plaintiff "'had some difficulty . . . responding professionally and courteously while adjudicating visas.'"  *Id.*  Along the same line, the 2011 EER explained that he "'should strengthen his ability to better communicate with colleagues.'"  *Id.*  In both EERs, the rater and reviewer checked the box indicating that "[c]andidate is likely to serve effectively but judgment is contingent on additional evaluated experience."  *Id.*  The plaintiff's third EER from his time in Rio de Janeiro, issued in June 2011, recommended that he be granted tenure.  *Id.* at 402.

The CTB first considered the plaintiff for tenure in the summer of 2012 and, based on the issues identified in his 2010 and 2011 EERs, deferred making a tenure decision to a later date.  *See id.* at 20–21 ("The Board . . . concluded that it could not yet make a definitive assessment of Daniel P. Aragon's potential to perform effectively over a normal career span, up to an including Class FS-01 . . . .  The Board hopes that in the next rating period, Daniel P. Aragon will demonstrate effective Interpersonal and Communications skills.").  The EERs addressing the plaintiff's performance in Rio de Janeiro are not challenged in this lawsuit.

2.        **Second Tenure Review**

Following his tour in Brazil, the plaintiff completed a 45-week intensive Arabic language course and then began work as a Public Affairs Officer ("PAO") at the U.S. Consulate General in Dubai, United Arab Emirates.  *Id.* at 8 n.1.  In that position, the plaintiff "manage[d] all aspects of public relations, social media outreach, and cultural programming in Dubai and five Northern Emirates."  *Id.* at 47.  The plaintiff reported to both the Consul General, Robert Waller, and the Country Public Affairs Officer at the U.S. Embassy in Abu Dhabi, a role filled by Robert Arbuckle and then by Alica Lejlic.  *Id.*

As PAO, the plaintiff supervised two Locally Engaged Staff, a Cultural Program Specialist ("CPS"), and an Educational Advisor.  *Id.*  The plaintiff's relationship with the CPS is at the center of this dispute.  As a general matter, the record appears undisputed that the CPS would often come to work "late or not at all, without letting [the plaintiff] know," AR at 321, and had other performance issues, *see e.g.*, AR at 405.  The issue appears to have come to a head within about two months of the plaintiff's arrival in Dubai, *id.* at 402, when, in October 2012, the CPS took extended, unapproved, leave to Jordan, *id.* at 289.  During her absence, "[t]he post was unable to find a guest list for a major election-related program that the employee was supposed to have prepared and left in the files."  AR at 405.  When, per Mr. Waller's instructions, the plaintiff met with the CPS to discuss her absence, the CPS became very upset and "started yelling and threatening to destroy all Public Affairs programming and quit."  *Id.*  The plaintiff maintains that Mr. Waller "initially supported [his] actions" to counsel the CPS but later "blamed [the plaintiff] for [the CPS's] behavior and did not support him for the remainder of the rating period."  *Id.* at 290.

In May 2013, Mssrs. Waller and Arbuckle prepared an EER for the plaintiff's file.  *See id.* at 35.  The May 2013 EER concluded, again, that the plaintiff "[wa]s likely to serve effectively but judgment [wa]s contingent on additional evaluated experience."  *Id.*  The EER listed "Managerial Skills" as the only Area for Improvement ("AFI"), citing in particular the plaintiff's counseling session with the CPS, which session ended with the CPS threatening to resign.  *Id.* at 36.  Mr. Waller noted, however, that in response to the incident, "Daniel took several FSI Distance Learning courses on management, modified his management style, and . . . improved his working relationship with the employee."  *Id.* (commending the plaintiff on his "progress" and expressing confidence that the plaintiff would "hone his skills so as to prevent difficult conversations from escalating in the future").

In light of the May 2013 EER, the CTB deferred a tenure decision for the second time, concluding that "it could not yet make a definitive assessment of Mr. Aragon's potential to perform effectively over a normal career span, up to an including Class FS-01."  *Id.* at 23.  The Board explained that although the plaintiff "ha[d] developed skills . . . that are important to a successful Foreign Service Officer career, for example, a strong work ethic and a positive attitude," some issues persisted, "specifically in Managerial and Interpersonal skills."  *Id.*  The CTB's decision noted the plaintiff's need to "prevent difficult conversations from escalating when dealing with locally employed staff."  *Id.*  The Board exercised its discretion to grant the plaintiff a third and final opportunity to obtain tenure and encouraged him to focus on "developing those skills needed to 'prevent difficult conversations from escalating when dealing with locally employed staff.'"  *Id.*

### 3.      Third Tenure Review

In November 2013, Mssrs. Waller and Lejlic prepared another EER for the plaintiff's personnel file.  *See id.* at 39–44.  While acknowledging the plaintiff's "positive contributions" to the consulate, Mr. Waller ultimately concluded that the plaintiff was "unlikely to serve successfully up to the FS-01 level" and thus "reluctan[tly]" declined to recommend the plaintiff for tenure.  *Id.* at 41.  The EER listed the plaintiff's managerial skills and interpersonal skills as two areas for improvement, citing his "difficulty supervising an employee in his section" as well as the plaintiff's need to be counseled about ways to ensure that representational events at the consulate run smoothly.  *Id.* at 43.  In light of this EER, the CTB denied the plaintiff tenure in the winter of 2013, thereby triggering his involuntary separation from the Foreign Service, effective May 4, 2014.  *Id.* at 262.

### C.      The Plaintiff's Grievance Over His 2013 EERs

The plaintiff filed a grievance with the State Department's Human Resources/Grievance Department ("HR/G") on April 22, 2014, which he supplemented on May 23, 2014.  *See id.* at 6–18.  The plaintiff was granted interim relief, meaning that he continued to work for the Foreign Service during the pendency of his grievance.  *See id.* at 8, 262.  During this period, the plaintiff received two additional EERs, one in 2014, completed by Mssrs. Waller and Lejlic, and one in 2015, prepared by two different supervisors.  Both EERs recommended that the plaintiff be granted tenure.  In the 2014 EER, Mr. Waller commended the plaintiff for, among other things, his strong leadership skills.  *See id.* at 49 ("Daniel supervised two Locally Engaged Staff . . . and actively developed their skills by identifying, suggesting and approving appropriate training.").  Mr. Lejlic agreed, stating that the plaintiff had "successfully advocated for the inclusion of his [CPS] in a 'visual diplomacy' training course" and had "empowered her to be innovating and

aggressive in advancing the consulate's social media activities." *Id.* at 50.  Likewise, the 2015

EER praised the plaintiff for his interpersonal and managerial skills.  The rater explained that

"[t]hanks to his deft touch in working with people, Daniel's greatest contribution to the office

emanated through his interpersonal skills."  AR at 351.  Indeed, according to the rater, "[s]hortly

after his arrival, Daniel skillfully and tactfully navigated several situations where clashing

personalities had previously created office gridlock." *Id.*  The reviewer for the 2015 EER

similarly emphasized that the plaintiff had effectively "defin[ed] clear, measurable work

requirements shortly after [his colleagues'] arrival" and "provided these colleagues with a

roadmap for . . . success[]." *Id.* at 352.  The plaintiff's "management style" "promoted a culture

of mutual respect[,] which was highlighted when he deftly counseled two interns on a chain of

command issue." *Id.*  According to the reviewer, "[i]nterpersonal skills were Daniel's strongest

area during the rating period, as he uniformly embodied equanimity and professional demeanor

in his interactions with colleagues and contacts." *Id.*

   While continuing to serve in the Foreign Service due to interim relief, the plaintiff

pursued his grievance with the HR/G.  The plaintiff's grievance asserted several claims.  First, he

alleged that Mr. Waller had created a "relentlessly hostile" work environment and that the

"Tenure Board's decision to deny . . . tenure [was] based on falsely prejudicial EERs . . .

received in 2013."[3] *Id.* at 8, 9, 12.  As to both the May and November EERs, the plaintiff argued

that Mr. Waller was "prejudice[d] against [him]" and therefore issued EERs with "diluted and

faint praise" after promising the plaintiff that he would be recommended for tenure. *Id.* at 9

---

[3]     The Foreign Service Act provides that "the term 'grievance' means any act, omission, or condition . . .
which is alleged to deprive a member of the Service . . . of a right or benefit authorized by law or regulation or
which is otherwise a source of concern or dissatisfaction to the member, including . . .  separation of the member
allegedly . . . predicated upon alleged inaccuracy, omission, error, or falsely prejudicial character of information in
any part of the official personnel record of the member."  22 U.S.C. § 4131(a)(1)(A); *see also U.S. Dep't State v.
Coombs*, 482 F.3d 577, 580–82 (D.C. Cir. 2007) (discussing the "falsely prejudicial" standard).

("Mr. Waller omitted significant accomplishments . . . that could have had a positive effect on a tenure decision."); *id.* at 17 (same).   The plaintiff further contended that the November EER "contain[ed] procedural violations," including that the plaintiff was not offered the requisite counseling for an employee not performing at an acceptable level and that Mr. Waller's decision not to recommend the plaintiff for tenure was in retaliation for the plaintiff's remarks to Office of the Inspector General personnel.   *Id.* at 11–13.   The plaintiff's grievance requested as relief: (1) a one-year extension of the plaintiff's limited career appointment; (2) redaction of the May 2013 EER's assessment of the plaintiff's career potential; (3) removal of the November 2013 EER from the plaintiff's personnel file, or, in the alternative, redaction of the assessment of his career potential; (4) a reconstituted summer 2013 CTB; (5) a reconstituted winter 2013 CTB; and (6) any other relief deemed appropriate.   *Id.* at 18.   The State Department HR/G denied the plaintiff's grievance "in full," *id.* at 64, concluding that he had not met his burden of "'establishing, by a preponderance of the evidence, that the grievance [wa]s meritorious,'" *id.* at 53 (quoting 22 CFR § 905.1).   The plaintiff appealed the HR/G's decision to the FSGB.

Before the FSGB, the plaintiff renewed his hostile work environment claim, arguing that he faced unusual challenges that "reasonably affected his performance and experience in Dubai," including (1) "reporting directly to two officers who did not often agree;" (2) "receiving half the full time language training normally necessary;" (3) "supervising staff that the rater conceded were challenging;" and (4) "serving in a position that is likely better suited for a more experienced officer."   *Id.* at 285.   The plaintiff also asserted that Mr. Waller's comments in the EERs had been retaliatory and that "[Mr.] Waller's bias and prejudice against [the plaintiff] led to inaccurate and falsely prejudicial comments in [his] May and November 2013 EERs."   *Id.* at

288 (arguing that the May 2013 EER omitted some of the plaintiff's accomplishments and that the November 2013 EER was "consumed by faint praise").

After denying the plaintiff's request for continued interim relief on the ground that he was unlikely to prevail on the merits, *see id.* at 259–73, the FSGB ultimately upheld the State Department's denial of the plaintiff's grievance.  In its decision, the FSGB concluded that the plaintiff "ha[d] not met the burden of proving that his working environment was hostile, that his rater was biased or prejudiced, that statements in his ratings were falsely prejudicial, that he was not provided adequate counseling and time to improve his performance, or that the rater's recommendation against tenure was in retribution for comments [the plaintiff] made to Office of Inspector General . . . inspectors."  *Id.* at 400.

With respect to its holding that the May and November 2013 EERs were not falsely prejudicial—the holding most prominently at issue in this case—the FSGB explained that it had "looked with special care at the rater's observations on how grievant handled the recurring difficulties in his relationship with his staff in Dubai," citing, in particular, "the CPS, since that was the basis for the weaknesses his rater found in grievant's managerial and interpersonal skills and the major reason for the Summer 2013 CTB's deferral of a decision on granting him tenure."  *Id.* at 418.  Despite the expressed heavy reliance on the EERs' description of the plaintiff's management of the CPS, the FSGB noted that "[t]he circumstances surrounding this aspect of grievant's performance are very complicated, and the record does not include third-party observations of key interchanges—particularly the first meeting at which grievant inquired about the missing guest lists."  *Id.*

Regarding the plaintiff's argument that Mr. Waller had failed to indicate "how difficult the [CPS] was to deal with," the FSGB concluded:

> [Mr. Waller] expected grievant as the section chief and supervisor to find out where the guest list had been saved, even though grievant had warned him of the employee's sensitivity.  It was a challenging task for a first-time supervisor, but not an unreasonable one.  We have no reason to dispute the rater's conclusion that grievant, as the section's supervisor, was responsible for setting the tone and making his inquiries in a way that would not provoke the employee.

*Id.* at 418–19.  Finally, the FSGB observed that although the plaintiff was faced with the "challeng[ing]" task of supervising locally employed staff early on in his career, "[m]any officers may eventually supervise large numbers of [locally employed staff]" and "[e]valuation of the skills required in effective supervision—i.e., the manner in which officers carry out their supervisory role—is an important consideration in evaluating their overall potential."  *Id.* at 419.  According to the FSGB, the plaintiff "ha[d] not shown that these challenges were unreasonable for an untenured officer on his second overseas assignment."  *Id.*  The plaintiff now appeals the FSGB's decision as arbitrary and capricious, in violation of the Administrative Procedure Act.[4]

## II.     LEGAL STANDARD

Pursuant to the Foreign Service Act of 1980 ("FSA"), "any aggrieved party may obtain judicial review of a final action of the [Foreign Service Grievance] Board in the district courts of the United States."  22 U.S.C. § 4140.  The FSA provides that the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, "shall apply without limitation or exception" to a district court's review of a decision by the FSGB.  22 U.S.C. § 4140(a).  Under the APA, a reviewing court may set aside a challenged agency action "only if it is 'arbitrary, capricious, an abuse of

---

[4]     The plaintiff also claims that the FSGB's decision violated his Fifth Amendment due process rights, *see* Compl. ¶¶ 42–44, but the plaintiff's briefing does not address this constitutional claim, even after this omission was pointed out by the Secretary, *see* Defs.' Mem. Supp. MSJ at 11, and thus this claim is abandoned.  *See O'Neal v. England*, No 03-5261, 2004 WL 758965, at *1 (D.C. Cir. 2004) (unpublished) ("Because appellant does not address . . . his section 1985 claim and his discrimination claim based on the purported racial slur, he has abandoned those claims."); *Saunders v. Mills*, 172 F. Supp. 3d 74, 94 (D.D.C. 2016) ("Ms. Saunders does not make any reference to her discrimination claim and fails to respond properly to the SBA's motion.  The discrimination claim will be dismissed."); *Stephenson v. Cox*, 223 F.Supp.2d 119, 122 (D.D.C. 2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on his behalf . . . .").

discretion, or otherwise not in accordance with law.'" *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)) (other internal quotations and citation omitted). The scope of review under the "arbitrary and capricious standard is 'highly deferential,'" *id*.; *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (same), and "narrow," such that a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, ⸺ U.S. ⸺, 132 S. Ct. 476, 483 (2011); *see also Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same). Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang*, 132 S. Ct. at 483–84, which is the "touchstone of arbitrary and capricious review," *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) (internal quotations and citation omitted). Simply put, "the agency must explain why it decided to act as it did." *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

The D.C. Circuit has summarized the circumstances under which an agency action would normally be "arbitrary and capricious" to include "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pharm. Research & Mfrs. of Am.*, 790 F.3d at 209. Thus, when an agency "'fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that

when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is
[ ] glaring [ ] we can declare with confidence that the agency action was arbitrary and
capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))); *Amerijet Int'l, Inc.
v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of
administrative law is that an agency set forth its reasons for decision; an agency's failure to do so
constitutes arbitrary and capricious agency action." (internal quotation marks and citation
omitted)).  "[C]onclusory statements will not do; an agency's statement must be one
of *reasoning*."  *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis
in the original).

    In APA cases involving cross-motions for summary judgment, "the district judge sits as
an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v.
Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Accordingly, this Court
need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts
reviewing agency action under the APA's arbitrary and capricious standard do not resolve
factual issues, but operate instead as appellate courts resolving legal questions." *James Madison
Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of
Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in an APA case, that "determining
the facts is generally the agency's responsibility, not ours"); *Sierra Club v. Mainella*, 459
F.Supp.2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to
determine whether or not as a matter of law the evidence in the administrative record permitted
the agency to make the decision it did.") (quotation marks and citation omitted)).  Judicial review
is limited to the administrative record, since "[i]t is black-letter administrative law that in
an APA case, a reviewing court should have before it neither more nor less information than did

the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir.

2014) (internal citations and quotation marks omitted; alteration in original); *see* 5 U.S.C. §

706 ("[T]he Court shall review the whole record or those parts of it cited by a party . . . .").

## III.   DISCUSSION

The plaintiff contends that his May and November 2013 EERs were "[f]alsely

[p]rejudicial due to [o]mission," Pl.'s Mem. Supp. MSJ at 8, 21, ECF No. 12, because they did

not adequately convey that the CPS was unusually difficult to supervise, *see id.* at 9, 21, and that

the FSGB's conclusion to the contrary is arbitrary and capricious.   Secondarily, the plaintiff

asserts that the FSGB failed to adequately account for the "unjust circumstances" of his

assignment in Dubai.  *Id.* at 29.  The plaintiff's arguments concerning the May and November

2013 EERs are addressed before considering whether the FSGB should have found that the

plaintiff's Dubai assignment was unsuitable.

### A.      The May 2013 EER

The Court turns first to the plaintiff's argument that the FSGB failed to consider all

relevant evidence and make proper findings of fact and then considers the plaintiff's arguments

concerning the FSGB's alleged failure to follow its own precedent.

#### 1.         The FSGB's Factual Findings and Consideration of Evidence

Before the FSGB, the plaintiff argued that the AFI in the May 2013 EER, which was the

basis for the CTB's decision to defer a tenure determination, was falsely prejudicial.  The AFI

addressed the narrow issue of the counseling session between the plaintiff and the CPS, which

occurred shortly after the plaintiff assumed his posting in Dubai and ended in the CPS

threatening to destroy all public affairs programming and resign.[5]  The FSGB acknowledged that

---

[5]         The targeted AFI in the May 2013 EER states, in full:

the plaintiff's "difficulties in his relationship with his [two locally employed staff,] and particularly the CPS, . . . was . . . the major reason for the Summer 2013 CTB's deferral of a decision granting him tenure," AR at 418, but nevertheless held that the May 2013 EER was not falsely prejudicial for failing to point out that the CPS was unusually difficult to supervise.  By the FSGB's assessment, "[t]he rater expected [the plaintiff] as the section chief and supervisor to [conduct a counseling session and] find out where the guest list had been saved . . . .  [This] was a challenging task for a first-time supervisor, but not an unreasonable one."  *Id.* at 418–19.  The plaintiff argues that the FSGB's conclusion is arbitrary and capricious because the FSGB failed to find that the CPS was unusually difficult to supervise and did not meaningfully consider relevant evidence.  Pl.'s Mem. Supp. MSJ at 8–9.

The FSGB's analysis of the plaintiff's claim that the May 2013 EER was falsely prejudicial is a textbook example of arbitrary and capricious decisionmaking.  Although the decision amply sets out the parties' respective arguments and factual assertions, *see* AR at 403–15, it does not state which factual assertions laid out in the background section of the decision were credited and which were rejected, nor does the decision begin to grapple with the record evidence as to whether the EER was falsely prejudicial for failing to discuss the CPS's well-documented pattern of insubordinate behavior, as well as evidence of the plaintiff's supervisory skills.  The FSGB correctly stated that no third-party accounts of the session were available, *id.* at 418, but the Board should not have ended its inquiry there, because not only is the evidence

---

Managerial: Early in the rating period, Daniel held a counseling session regarding an employee's performance.  The session ended with the employee threatening to resign.  Afterwards, Daniel took several FSI Distance Learning courses on management, modified his management style, and has improved his working relationship with the employee.  I am pleased to note his progress and know he will further hone his skills so as to prevent difficult conversations from escalating in the future.

AR at 36.

undisputed that the CPS's conduct was sufficiently egregious to warrant, at a minimum, counseling, but also the record contains significant circumstantial evidence as to the respective temperaments and behavior of the two participants in the session, the CPS and the plaintiff.  The FSGB's decision is arbitrary and capricious insofar as it failed to account for this evidence in assessing whether the AFI should have indicated that the CPS was difficult to supervise.

As for evidence that the CPS was insubordinate, Mr. Waller himself recognized in an interrogatory response that "the CPS felt unaccountable to anyone" and that she "felt little respect for Mr. Aragon."  *Id.* at 335.  Likewise, Krista Lorenger, the Office Management Specialist at the U.S. Consulate in Dubai, attested that the plaintiff had "mentioned more than once, that [the CPS] was disrespectful and hard to manage" and that "[t]here were times she came in late or not at all, without letting Daniel know."  *Id.* at 321.  Moreover, the record shows that the CPS had an "apparent pattern" of abusing sick leave and would disappear from work for extended periods of time.  *Id.* at 42; *see also id.* at 335 (describing the manner in which the CPS "took sick leave immediately before or after a block of annual leave[, which] suggest[ed] that she was abusing sick leave in order to augment her annual leave").  This apparently lax office culture was extant before the plaintiff's arrival, leaving him with the task of changing that culture to ensure that employees, such as the CPS, on the U.S. Government payroll complied with the most basic work performance rules of coming to work on time and providing notice of absences.

Yet more striking, as recounted in the background section of the FSGB's decision, the CPS was granted three days' leave to travel to Jordan but then failed to show up for work for a full 13 days, during which time the post was unable to locate a guest list for a "major election-related program that the [CPS] was supposed to have prepared and left in the files."  *Id.* at 405.  The plaintiff tried to reach the CPS to inquire about her whereabouts and the guest list, but she

ignored the plaintiff's calls, texts, and emails.  *Id.* at 10.  According to the plaintiff, it was later

discovered that the CPS had neglected to prepare the guest list.  *Id.*  When counseled about her

absence by the plaintiff, the CPS apparently became very upset and threatened to resign.  The

plaintiff maintains that he conducted the counseling session "calmly and with concern."  *Id.*  The

record contains evidence to suggest that the CPS's work ethic and performance behaviors were

engrained because the Country PAO, Mr. Arbuckle, had long allowed the CPS to carry on as she

pleased.  *See, e.g.*, *id.* at 321 ("[The CPS] was permitted to do whatever she wanted with the

support of PAO Arbuckle.").[6]  The FSGB paid this evidence lip service in the section of its

decision summarizing the plaintiff's claims, *see id.* at 405, but the Board did not refer to it, let

alone grapple with it, in deciding that the AFI concerning the counseling session was not falsely

prejudicial for completely omitting any reference to the events giving rise to the counseling

session or the context, in which even before the plaintiff's arrival, the Dubai office had such

deficient management that the CPS was able to develop and engage in a pattern of poor work

behavior.

     As for circumstantial evidence of the plaintiff's ability properly to handle counseling

sessions, the FSGB inexplicably ignored the plaintiff's 2014 and 2015 EERs, both of which

recommend that the plaintiff be granted tenure, and one of which was completed by Mssrs.

Waller and Lejlic.  The EERs praise the plaintiff for his management and interpersonal skills, as

detailed above.  Although these EERs were issued after the plaintiff was denied tenure and thus

were not seen by the CTB in making that decision, the EERs were part of the record before the

---

[6]     That prior agency management in Dubai allowed such poor work habits to persist likely made the
plaintiff's effort to enforce the most basic workplace rules more difficult and makes it all the more impressive that
the plaintiff was, apparently, ultimately successful in reining in the CPS's behavior.  *See, e.g.*, AR at 42 (noting that
after the plaintiff spoke with the CPS about her "apparent pattern of abusing sick leave, . . . there were no further
incidents of suspected leave abuse during the rating period").  As the FSGB itself has noted, a supervisor will
"almost inevitabl[y]" have "a difficult relationship" with an employee when the supervisor "is trying to effect
changes" in the employee's behavior.  FSGB Op. 2006-052 at 13.

FSGB.  They are at least probative of the plaintiff's interpersonal skills, and thus shed light on

the extent to which the AFI in the May 2013 EER was falsely prejudicial.  Consequently, the

FSGB's failure to cite the 2015 EER, and its relegation of the 2014 EER to a footnote without

meaningfully considering the EER's contents, was arbitrary and capricious.  *See, e.g.*, *Morall v.*

*Drug Enf't Admin.*, 412 F.3d 165, 178 (D.C. Cir. 2005) ("To be clear, DEA's decision does not

withstand review because the agency decisionmaker *entirely ignored* relevant evidence.");

*Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 216 (D.C. Cir. 1994) (citing *Burlington Truck*

*Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and holding that it was arbitrary and

capricious for the Board to ignore relevant testimony); *compare Ackerman v. United States*, 324

F. Supp. 2d 1, 6 (D.D.C. 2006) (holding that the court cannot "second-guess" the FSGB's

decision to "ascribe more importance" to certain EERs in the plaintiff's personnel file, but

suggesting that it would be arbitrary and capricious for the FSGB to "fail[] to consider" EERs

altogether).

     The Board likewise failed to account for the testimonials offered by six of the plaintiff's

colleagues, who worked with him in 2013, which are also probative of the plaintiff's demeanor

in the workplace.[7]  For example, after praising the plaintiff's "enthusiastic spirit," one colleague

stated, "I have always seen Daniel to be cordial and polite to staff and colleagues."  AR at 240–

41.  Another coworker expressed that the plaintiff "is a sensitive, kind, and considerate person

who cares about the people around him."  AR at 242.  The plaintiff's "peer" officer, stationed at

the U.S. Embassy in Abu Dhabi, who worked "closely" with the plaintiff, reported that he "ha[d]

---

[7]    The plaintiff contends that "the FSGB ignored the evidence that the plaintiff is a gentle, considerate and polite person."  Pl.'s Reply at 18.  The Court notes that the FSGB referenced the "supportive testimonials" in the record, *see* AR at 420 (concluding that the testimonials "offered little that might dispute the rater's conclusions about [the plaintiff's] performance or potential"), but it did so only with respect to the plaintiff's claim that "the rater focused excessively on [the plaintiff's] deficiencies in managerial and interpersonal relationship skills, *id.* at 419.  The Board did not consider these testimonials in addressing the plaintiff's claim that the AFI in his May 2013 EER was falsely prejudicial.

met few people in the Foreign Service who are as caring and considerate as Daniel."  AR at 244

(noting that in the Foreign Service, "the importance of [the plaintiff's] generosity and warmth

can be underestimated").  Another officer commented on, *inter alia*, the plaintiff's "calm

demeanor," ability "to navigate the complex personalities that comprise a diplomatic mission,"

and "openness to others' views."  AR at 249.

In setting out the parties' respective factual assertions but failing to grapple with any of

the foregoing record evidence, the FSGB's decision closely resembles the FSGB decision that

was rejected as arbitrary and capricious in *Toy v. United States*, Civ. No. 00-cv-929 (D.D.C. Dec.

7, 2000).  In that case, the district court remanded to the FSGB for additional fact-finding

because although the FSGB had sufficiently "recounted the parties' competing versions of the

facts," it had failed to "make clear which factual contentions it adopted and which it rejected, and

why it did so."  Mem. Op. at 10, *Toy v. United States*, Civ. No. 00-cv-929 (D.D.C. Dec. 7, 2000)

ECF No. 23; *see also Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 64 (D.D.C. 2013) ("By not

discussing plaintiff's evidence, the Secretary leaves plaintiff and the Court to scratch their heads

as to why the Secretary found plaintiff's evidence unpersuasive.  An agency action that lacks

explanation is a textbook example of arbitrary and capricious action.") (citing *Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))); *Ehrman v. United States*, 429

F. Supp. 61, 68 (D.D.C. 2006) ("Although the FSGB's Decision thoroughly summarized the

parties' positions, its findings reflect a selective reliance on the Department's conclusory

statements in the administrative record . . . .");  Mem. Op. at 10 n.6, *Olsen v. Powell*, Civ. No. 02-

cv-1371 (D.D.C. Feb. 4, 2005), ECF No. 46 ("While [the government] is correct that eight pages

of the FSGB's decision discussed the issue of anti-homosexual bias, the majority of those eight

pages simply articulated the evidence and arguments on both sides.  In actuality, the FSGB

devoted only two pages of analysis to the issue and merely concluded that the evidence need not

be considered, without analyzing the evidence as it pertained to the EERs."). As in *Toy*, the

FSGB "stated its conclusion," *i.e.*, that the May 2013 EER was not falsely prejudicial, but the

Board "did not sufficiently articulate the requisite rational connection between that conclusion

and its factual findings." Mem. Op. at 10, *Toy*, No. 00-cv-929 (internal quotation marks

omitted).[8]

The Secretary contends that the AFI comment concerning the counseling session with the

CPS was only one minor part of the EER, which on the whole was very positive about the

plaintiff's performance. *See* Defs.' Mem. Supp. Cross-MSJ at 18 ("Aragon's arguments,

however, ignore the limited criticism contained in the May 2013 EER. That criticism was

limited to the observation that Aragon, as a supervisor, needs to be able to handle counseling

sessions with employees."). Though true that the EER largely praised the plaintiff's work, as the

FSGB itself noted, the AFI was dispositive of the decision initially to defer and ultimately to

deny tenure. *See Shea v. United States*, 45 F. Supp. 2d 54, 57 n.1 (D.D.C. 1999) (rejecting the

Secretary's argument that the challenged EER was not falsely prejudicial because the EER was,

"as a whole . . . glowing" and explaining that "even the relatively minor criticisms highlighted by

the plaintiff are properly considered in a review of the FSGB's decisions"). Furthermore, the

Secretary appears to contend that the FSGB's analysis was satisfactory because the FSGB found

that it was "not . . . unreasonable" to expect the plaintiff to prevent the counseling session with

the CPS from escalating. AR at 418. This conclusion, however, has little if any bearing on the

ultimate question whether the inclusion of information about the CPS's pattern of

---

[8]     The Secretary sets out a bullet-point list of reasons the FSGB supposedly offered for the conclusion that the
May and November 2013 EERs were not falsely prejudicial. *See* Defs.' Mem. Supp. Cross-MSJ at 14–15. Almost
all of these reasons, however, relate to other of the plaintiff's claims asserted before the FSGB, which are not at
issue in this case, and therefore do not suffice to explain the Board's determination as to false prejudice.

insubordination and the concomitant challenge faced by the plaintiff in changing a prior lax management culture to enforce basic workplace rules and performance standards, would have affected the CTB's tenure decision.  Even if the FSGB's conclusion that it was reasonable to expect the plaintiff to prevent the counseling session from escalating were relevant, the correctness of that conclusion necessarily depends upon the conduct of both the person being counseled and the person conducting the counseling session and the workplace environment where such a counseling session became necessary—none of which were addressed in the FSGB's decision.

The FSGB was not required to reach any particular conclusion based on the foregoing evidence, but the Board was required to at least consider the evidence in its analysis of the plaintiff's claims.  Accordingly, remand to the FSGB for further proceedings is required.  On remand, the FSGB should more fully account for the evidence in the record, make relevant factual findings, and connect those findings to the ultimate conclusion whether the May 2013 EER was falsely prejudicial.  *See Ehrman*, 429 F. Supp. 2d at 61 (remanding to the FSGB after finding that its decision was arbitrary and capricious); *Toy*, 263 F. Supp. 2d at 6 ("This court remanded the plaintiff's case to the FSGB . . . because of deficiencies in the FSGB's findings of fact.").[9]

## 2.    The FSGB's Consideration of Its Previous Decisions

The plaintiff further argues that the FSGB's decision was arbitrary and capricious because, in finding that the May 2013 EER is not falsely prejudicial, "the FSGB failed to follow

---

[9]        In support of the FSGB's determination, the Secretary argues that the plaintiff missed his opportunities to correct the EERs, since each EER contains a section for the officer's self-evaluation.  *See* Defs.' Mem. Supp. Cross-MSJ at 22, 24.  As the plaintiff points out, however, *see* Pl.'s Reply at 24, the FSGB itself has drawn the commonsense conclusion that Foreign Service officers "are generally advised that the prudent course is to accept criticism offered in an EER and not to try to refute it," FSGB Op. 2006-052 at 17.  In any event, the plaintiff did note the CPS's "performance issues and resistance to change" in his May 2013 EER self-evaluation.  AR at 37.

its own precedents." Pl.'s Mem. Supp. MSJ. at 13 (citing Mem. Op. at 17, *Menyhert v. United States*, Case No. 99-cv-3018 (D.D.C. Feb. 26 2001), ECF No. 24 ("[T]he Court finds that the conclusion of the FSGB . . . departs from the FSGB's precedent and is internally inconsistent. Thus, the court finds . . . the FSGB's decision is arbitrary and capricious.")); *see also id.* at 13–20.

"Like a court, '[n]ormally, an agency must adhere to its precedents in adjudicating cases before it.'" *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119–20 (D.C. Cir. 2010) (quoting *Consol. Edison Co. of N.Y., Inc. v. FERC*, 315 F.3d 316, 323 (D.C. Cir. 2003)). The D.C. Circuit has explained that an agency is "not required 'to grapple with every last one of its precedents, no matter how distinguishable,'" *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 842 F.3d 1271, 1274 (D.C. Cir. 2016) (quoting *Jicarilla*, 613 F.3d at 1120), but, "[a]t the same time, we have never approved an agency's decision to completely ignore relevant precedent," *Jicarilla*, 613 F.3d at 1120. "[A]n agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Id*. Thus, "[w]hen an agency departs from its prior precedent without explanation, . . . . its judgment cannot be upheld." *Manin v. Nat'l Tranp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011). In this case, then, if the FSGB entirely ignored contradictory decisions, its decision was arbitrary and capricious. *Jicarilla*, 613 F.3d at 1120 ("Silence in the face of inconvenient precedent is not acceptable."); *compare Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 414 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016) ("Because the Secretary offered a reasonable explanation as to why *Guidiville* was distinguishable from the Cowlitz's case, no violation of the APA has occurred.").

According to the plaintiff, a long line of FSGB decisions "hold[s] that the failure to mention mitigating factors renders an EER criticism misleading or 'falsely prejudicial,' in grievance terminology, or constitutes an 'omission.'"  Pl.'s Mem. Supp. MSJ at 13.   The plaintiff cites numerous FSGB decisions but focuses on three cases that he describes as "strikingly similar to the instant case."  *Id.*  In FSGB Op. 1994-085/1995-036, the decision principally relied upon by the plaintiff, the grievant had received an EER that stated, in pertinent part, that he "patronized one staff member by speaking for [her]" during a meeting.  FSGB Op. 1994-085/1995-036 at 17.  The grievant challenged the EER as unfairly prejudicial for failing to mention the "difficulties of working with the staff member (his deputy) flowing from her particular sensitivities and perceptions."  *Id.*  The FSGB agreed, explaining that "it was incumbent on the rater to have recognized and in some manner reflected in the EER the complexities and challenges grievant faced in supervising his deputy."  *Id.* at 18.  Ultimately, the FSGB held that the EER was falsely prejudicial because its criticism of the grievant's managerial skills was "presented devoid of context."  *Id.*  The other FSGB decisions that the plaintiff cites involve roughly similar factual circumstances.  *See, e.g.*, FSGB Op. 2006-52 at 14 (finding "serious problems" with an LSE's performance, which were omitted from the grievant's EER, and holding that the EER was falsely prejudicial because "[t]he reasonable reader could not infer these mitigating circumstances [of the LSE's poor performance] from the strongly worded AFI");[10] FSGB Op. 2004-61 at 37 (holding that an EER was falsely prejudicial where it

---

[10]     The Secretary argues that FSGB Op. 2006-052 is distinguishable from the instant case, noting the FSGB held there that the challenged EER was falsely prejudicial because it referred to the grievant's problems managing her "staff," when in fact she supervised only one employee.  Defs.' Reply Supp. Defs.' MSJ ("Defs.' Reply") at 13, ECF No. 17.  This focus on nomenclature only compounds the apparent strain to find material differences from the instant case.  In FSGB Op. 2006-052, the use of the term "staff" to refer to a single employee was only one of at least two reasons that the EER was falsely prejudicial, with a second reason being the EER's omission of any information about the subordinate employee's performance issues, FSGB Op. 2006-052 at 14, which were so significant that they prompted the rater in that case to "approve[] the grievant's decision to place this particular employee on probation,"  Defs.' Reply at 13.  Similarly, the rater in this case, Mr. Waller, was aware that the CPS

conveyed "non-specific and . . . unwarranted criticism" of the grievant concerning the grievant's alleged inability to manage a particularly difficult employee).[11]

The Court agrees with the plaintiff that FSGB Op. 1994-085/1995-036 appears remarkably similar to the instant case insofar as the plaintiff in FSGB Op. 1994-085/1995-036 argued that a criticism of his conduct vis-à-vis a subordinate employee in a one-off meeting, without any explanation of the broader context, was falsely prejudicial. The Secretary argues that the plaintiff has "overstated" the FSGB's previous holdings and that these cases are distinguishable from the instant case on their facts.[12] *See* Defs.' Mem. Supp. Cross-MSJ at 20; Defs.' Reply at 13 ("[The plaintiff's] contention that the FSGB failed to follow its own precedent is based on over-generalizations of prior, fact-specific rulings."). That may very well be, but as the D.C. Circuit has explained, "[a] court reviewing an *ipse dixit* outcome that seems inconsistent with proffered precedent is left to attempt to discern for itself which factual differences might have been determinative, . . . and to assess whether making such distinctions controlling is rational or arbitrary, again without any agency explanation of why particular factors make a difference." *See Lemoyne–Owen College v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 1997) (J.

---

had abused workplace time-and-attendance rules, including taking unauthorized leave, and had little respect for authority, but instead of urging more formal sanctions as applied in FSGB Op. 2006-052, Mr. Waller cautioned the plaintiff against formally writing up the CPS for insubordination, suggestion that course of action would be "too heavy handed," AR at 56, thereby providing additional evidence of the lax management culture in which the plaintiff had to operate and the importance of this contextual evidence. In other words, the distinctions that the Secretary seeks to draw merely confirm that the plaintiff confronted a more challenging situation with an insubordinate employee and an apparently weak senior management culture than the grievant in FSGB Op. 2006-052 but nonetheless suffered a more damaging conclusion from the FSGB.

[11]     The other FSGB decisions that the plaintiff cites are FSGB Op. 1984-054, FSGB Op. 1992-078, FSGB Op. 2003-034C, and FSGB Op. 2015-36.

[12]     As for FSGB Op. 1994-085/1995-036 in particular, which the plaintiff contends is most analogous to the instant case, the Secretary argues that "the closest the FSGB came" to "articulat[ing] a standard that required the inclusion of mitigating factors in a review" FSGB 1994-085/1995-036 was "to observe that 'unjustified excesses, either in praise or criticism of an officer, . . . are to be avoided.'" Defs.' Mem. Supp. Cross-MSJ at 20. In so arguing, the Secretary overlooks, either intentionally or unintentionally, the most pertinent holding in the case, as laid out above: that the EER was falsely prejudicial for not including any information about the unusual difficulties of supervising the subordinate employee.

Roberts).  When it comes to distinguishing FSGB precedent, however, it is the FSGB—not the

Court, or the parties—that must ultimately "provide a legitimate basis for sustaining agency

action."  *Id.*  Consequently, on remand, the FSGB should account for the seemingly relevant

decisions cited by the plaintiff and explain why they do not compel an outcome different than the

one originally reached.  *Id.* (remanding a case to the NLRB to allow the agency to provide "an

adequate explanation of [the] apparent departure[] from precedent").[13]

**B.      The November 2013 EER**

The plaintiff argues that the FSGB erred in validating the November 2013 EER because

the EER "omits the key mitigating circumstance concerning the CPS, and the only examples [of

the plaintiff's conduct] *contradict* the recommendation against tenure."  Pl.'s Mem. Supp. MSJ

at 21 (emphasis in original).  Each argument is addressed in turn.

**1.      The FSGB's Analysis of the Claim that the November 2013 EER Was
Falsely Prejudicial**

Like the May 2013 EER, the November 2013 EER took issue with the plaintiff's

management of the CPS, though the criticism in the November EER was broader—addressing

the plaintiff's relationship with the CPS writ large, rather than one problematic counseling

session.   In the November EER, Mr. Waller explained that although the plaintiff "has many

admirable skills and earnestly wants to remain in the Foreign Service, . . . he is unlikely to serve

successfully up to the FS-01 level" because "his performance as a supervisor has been uneven

and punctuated by moments of interpersonal tension."  AR at 41; *see also id.* at 42 ("Daniel's

relationship with one of his employees was tense at times.").  The corresponding AFI provides:

---

[13]      The plaintiff also contends that the FSGB's decision contained two "patently erroneous" findings of fact.
Pl.'s Mem. Supp. MSJ at 12.  The Secretary contends that the FSGB did not err.  *See* Defs.' Mem. Supp. Cross-MSJ
at 19.  The Court need not decide these discrete factual issues since, on remand, the FSGB will have to make its
findings anew based on the fulsome record evidence.

> Area for improvement: Interpersonal/managerial: Daniel had difficulty
> supervising an employee in his section [the CPS].  I counseled Daniel to
> include post's Management Section in any counseling sessions he held
> with the employee in question, and to conduct meetings with that
> employee on neutral ground (rather than her work space or his office) to
> facilitate open communication.  Moving forward, Daniel would benefit
> from continued refinement of his interpersonal and managerial skills.

*Id.* at 43.  As with the May 2013 EER, the plaintiff argues that the November 2013 EER is

falsely prejudicial because it does not convey to the reader "key mitigating circumstances

concerning the CPS," *i.e.*, that she was "volatile, insubordinate, and exceptionally difficult to

supervise."  Pl.'s Mem. Supp. MSJ at 21.  The Secretary contends that this argument fails

because the criticism in the AFI "is not 'excess[ive]'—but instead is tempered by praise—nor is

it presented in an unusually 'stark' manner."  Defs.' Mem. Supp. Cross-MSJ at 23 (citing FSGB

Op. 1994-85).[14]

The FSGB appears to have largely overlooked the plaintiff's argument that the November

2013 EER was falsely prejudicial.  The "Overview" section of the FSGB's decision, which is

separate from the decision itself, notes that the Board concluded that the plaintiff "ha[d] not met

his burden of proving that . . . statements in his 2013 EERs were falsely prejudicial."  AR at 400.

In discussing the parties' positions, the FSGB further noted "[the plaintiff] contends that his

being denied tenure stemmed from receiving *two* biased *and falsely prejudicial* EERs in 2013."

---

[14]    The Secretary also argues—for the first time in his reply brief—that the plaintiff waived this argument that the November 2013 EER was falsely prejudicial by not raising it before the FSGB.  *See* Defs.' Reply at 2–3.  The plaintiff therefore has had no opportunity to respond to the Secretary's waiver argument.  As the D.C. Circuit has explained, "a party may waive its own waiver argument by not raising it in a timely fashion."  *Southeast Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 n.7 (D.C. Cir. 2009) (holding that the HHS's argument, raised for the first time at oral argument was "waived because HHS did not raise [the argument] with th[e] court at the appropriate time"); *accord Belton v. Wash. Metro. Area Transit Auth.,* 20 F.3d 1197, 1202 (D.C. Cir. 1994).  In any event, the plaintiff did argue before the FSGB that "the November 2013 EER watered down Mr. Aragon's performance and *ignored relevant conduct by [the CPS]*, instead laying the blame on Mr. Aragon's alleged subpar manager skills.  AR at 293.  More importantly, in summarizing the plaintiff's position, the FSGB plainly stated that the plaintiff "contend[ed] that his being denied tenure stemmed from receiving *two* biased *and falsely prejudicial* EERs in 2013."  *Id.* at 404 (emphasis added).  Thus, the plaintiff gave the FSGB the requisite "fair opportunity to pass on a legal . . . argument."  *Nat'l Ass'n Mfrs. v. U.S. Dep't Interior*, 134 F.3d 1095, 1112 (D.C. Cir. 1998).

*Id.* at 404 (emphasis added).  Yet, the FSGB does not expressly circle back to the plaintiff's argument that the November 2013 EER was falsely prejudicial in its analysis of the plaintiff's claims.  The balance of the FSGB's discussion about whether the EERs were falsely prejudicial is devoted to the May 2013 EER.  *See id.* at 418–19.  The FSGB's failure to engage with the plaintiff's claim that the November 2013 EER was falsely prejudicial is arbitrary and capricious.  *See Del. Dep't of Natural Resources & Entl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015) ("We will reverse . . . when the agency did not 'engage the arguments raised before it.'" (quoting *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998))); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016), *appeal dismissed sub nom. Sierra Club v. Jewell*, No. 16-5168, 2016 WL 4098850 (D.C. Cir. July 26, 2016) ("[T]he agency 'must, of course, reveal the reasoning that underlies its conclusion.'" (quoting *Transcon. Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995))); *Vince v. Mabus*, 852 F. Supp. 2d 96, 100 (D.D.C. 2012) ("An agency's final decision may be rendered arbitrary and capricious if it is not accompanied by 'a reason that a court can measure' with respect to each of the claimant's arguments." (quoting *Fuller v. Winter*, 538 F. Supp. 2d 179, 192 (D.D.C. 2008))).  Remand to the FSGB for a fuller consideration of the plaintiff's argument that the November 2013 EER was falsely prejudicial is warranted "for 'the exercise of reasoned decisionmaking.'"  *Sierra Club*, 177 F. Supp. 3d at 541 (quoting *Am. Trucking Ass'n v. EPA*, 600 F.3d 624, 631 (D.C. Cir. 2010)).[15]  On remand, the FSGB should consider all relevant evidence in the record, including, *inter alia*, the 2014 and 2015 EERs, as well as the plaintiff's colleagues' testimonials.

---

[15]    In defense of the FSGB's decision, the Secretary argues that the criticism in the November 2013 EER is not excessive and is tempered by praise and that Mr. Waller "had a good faith basis to conclude that [the plaintiff] needed to improve his management style and interpersonal skills."  Defs.' Mem. Supp. Cross-MSJ at 23.  This argument is properly addressed in the first instance by the FSGB on remand.

### 2.     The FSGB's Alleged Failure to Cite Examples

The plaintiff's second argument concerning the November EER is that the FSGB clearly

erred in finding that the criticisms in his November EER "are supported by examples."  AR at

417.  According to the plaintiff, "the only examples [of the plaintiff's conduct] *contradict* the

recommendation against tenure."  Pl.'s Mem. Supp. MSJ at 21; *see also id.* at 22–23 (emphasis

in original) (arguing that the November 2013 EER contains only "strongly positive examples of

Plaintiff's supervisory and interpersonal skills" that contradict the criticisms in the EER).[16]  The

plaintiff cites qualitative feedback provided by Mr. Waller on page 4 of the EER, which

feedback commends the plaintiff's managerial and interpersonal skills.  *See* AR at 42 (remarking

that the plaintiff had deftly delivered a warning to the CPS concerning her pattern of abusing sick

leave); *id.* (noting that the plaintiff "generally worked well with colleagues").  Careful review of

the EER, however, indicates that the positive feedback was also accompanied by some negative

examples of the plaintiff's managerial and interpersonal skills.  For example, with respect to the

plaintiff's managerial skills, Mr. Waller wrote that "[al]though Daniel became more adept at

planning representational events, I counseled him about ensuring that critical items such as guest

lists and invitations are shared with the Front Office on a proactive basis, and that changes to key

information (i.e., start times) are flagged in a timely manner."  *Id.*[17]  As for the plaintiff's

interpersonal skills, Mr. Waller reported that "Daniel's relationship with one of his employees

was tense at times."  *Id.*[18]  Thus, the Court cannot conclude that the FSGB clearly erred in

---

[16]     Relatedly, the plaintiff summarily asserts that Mr. Waller "violate[d] the EER form's instructions in the AFI section that provides as follows: 'Justify your recommendation with examples . . . .'"  *Id.* at 23.

[17]     This example refers to an event at the Consulate featuring a band called The Act of Congress.  The event generated a low turnout, in part due to a government shutdown and, according to Mr. Waller, "in part [due] to confusion about the starting time for the concert—confusion that Mr. Aragon created by not cc'ing the Front Office on the invitations his office sent out to members of the general public."  *Id.* at 134.

[18]     The Secretary points to additional examples of the plaintiff's performance in the EER, but those examples are listed under skills sets other than "Managerial" and "Interpersonal."  For instance, the "Substantive knowledge" section of the EER explains that the plaintiff and his team had "planned to surprise attendees" at an event "with an

finding that the criticisms in the November 2013 EER were supported by examples.  Though the

overall tenor of the EER was highly laudatory, the EER did contain examples of the plaintiff's

managerial and interpersonal shortcomings.[19]  Accordingly, the FSGB did not clearly err in

holding that the criticisms in the November 2013 EER were supported by examples.

### C.    Unjust Circumstances of the Assignment in Dubai

The plaintiff contends that the FSGB "erred" in its final decision by not giving weight to

the unjust circumstances of the assignment," including that (1) he reported to two supervisors—

Mr. Waller and Mr. Arbuckle—with conflicting agendas; (2) he had not received adequate

Arabic language training; and (3) the position required a more experienced officer.  Pl.'s Reply

at 32; *see also* Pl.'s Mem. Supp. MSJ at 29–35.  Notwithstanding this contention, in its

preliminary decision addressing the plaintiff's request for interim relief pending a final FSGB

decision, the FSGB referenced each of these circumstances.  Specifically, the FSGB

acknowledged "that grievant found himself in a situation that would be challenging for any

Public Diplomacy officer in his first assignment in that specialty," particularly that "[h]e reported

directly to two officers—the [Consul General] (as rater) at the post where he was assigned

---

un-vetted Egyptian Imam who would deliver the call to prayer" notwithstanding the "broader political context (i.e., an Emirati government furious with the Islamist government in Egypt at the time, and deeply suspicious of what it perceived as U.S. support of the Muslim Brotherhood in Egypt and elsewhere."  *Id.*  Mr. Waller then contacted the Imam to "thank him for his willingness to support [the] event" and "let him know that his services would not be necessary."  *Id.*  The Secretary argues that, "[a]lthough included in the review under the heading of 'substantive knowledge,' this situation also reflected negatively on Aragon's supervisory abilities because of his staff's inability to resolve the situation without Mr. Waller's assistance."  Defs.' Mem. Supp. MSJ at 25–26.  The FSGB, however, did not refer to this incident in its decision, and the Court will decline the Secretary's invitation to make assumptions about any possible unstated rationale by the FSGB.

[19]      In arguing that the FSGB clearly erred in finding that the criticisms in the EER were supported by examples, the plaintiff also takes issue with the FSGB's finding that "what [Mr. Waller] wrote in the EERs [was] rather understated."  AR at 419.  The plaintiff surmises that, "[i]n crediting the 'strong misgivings' expressed by the rater about Plaintiff, the FSGB presumably referred to the rater's claim made to HR/G in response to Plaintiff's challenge to the EERs."  Pl.'s Mem. Supp. MSJ at 26.  "Specifically, the rater told HR/G that '[a]t a post with more than 200 employees, [the plaintiff] was the least effective officer on . . . staff and [the] primary personnel concern."  *Id.*  The plaintiff contends that this statement "is not credible" in light of, *inter alia*, the 2014 EER, in which Mr. Waller praised the plaintiff, *see id.* at 25, and colleagues' assessments of Mr. Waller's managerial skills, *id.* at 27–29.  The Court has already instructed the FSGB to consider all relevant evidence on remand, including, specifically, the 2014 EER.

. . . and the [Country PAO] (as reviewer) in the capital city about an hour's drive away," but "that these two officers apparently often did not agree on [Public Diplomacy] program or management matters." AR at 271.  Indeed, the FSGB noted "in the record that the OIG inspection team had suggested preliminarily that in the future a more experienced officer be assigned to this position." *Id*.  In addition, the FSGB recognized that the plaintiff "had received only about half the full-time language training that the Foreign Service Institute considers normally necessary for an officer to reach the [Speaking-3/Reading-3] professional proficiency level in a very difficult language like Arabic." *Id*.  Finally, the FSGB mentioned that "grievant had to deal with problems in supervising his staff that the rater himself conceded were challenging." *Id*.  None of "these challenges" was found to be "unreasonable for an untenured officer," but they were "kept [] in mind" as the FSGB "considered grievant's request." *Id*.

In light of this express language, the plaintiff's criticism of the FSGB as erring for not considering these same circumstances was initially unclear.  Fleshing out this argument for the first time in his reply, the plaintiff appears to argue that the "purpose" of the career candidate program is to provide "'a comprehensive program of *appropriate* training, *assignment*, evaluation, counseling and review,'" Pl.'s Reply at 32 (quoting 3 FAM § 2241.2), and, "[i]n not making a finding of fact" as to whether the position was suitable for the plaintiff, "the Board violated Plaintiff's rights under the Foreign Service Act of 1980," *id.* at 33–34, which states that "the Board . . . shall include findings of fact and a statement of reasons for the decision," 22 U.S.C. § 4137(a).  To the extent that the circumstances of the plaintiff's tour in Dubai bear on his ultimate claims that the May and November 2013 EERs were falsely prejudicial, the FSGB

should consider all the evidence concerning whether the PAO position was "suitable" for the plaintiff.[20]

## IV.    CONCLUSION

The plaintiff, the Foreign Service, and American taxpayers have invested heavily in the plaintiff's career as a Foreign Service officer, and the FSGB does a disservice when it renders a decision that ignores significant parts of record and fails to connect rationally the underlying facts to its ultimate conclusion.  This is what the FSGB did in finding that the May and November 2013 EERs were not falsely prejudicial.  For these reasons, the FSGB's decision is vacated with respect to its conclusion that these EERs were not falsely prejudicial, and this action is remanded to the FSGB for further proceedings consistent with this Memorandum Opinion.[21]

An appropriate Order accompanies this Memorandum Opinion.

Date:  February 23, 2017

_____
BERYL A. HOWELL
Chief Judge

---

[20] The Court notes that the FSGB already made an express finding, in its final decision, concerning the plaintiff's assertion that he was unfairly asked to report to two supervisors with conflicting agendas.  In particular, the FSGB held that the plaintiff had not "describe[d] the nature of the . . . disagreements [between the plaintiffs' two bosses] or their impact, if any, on his ability to carry out his responsibilities."  AR at 417.  The plaintiff acknowledges the Board's conclusion and yet still fails to point to any harm in its submissions to this Court.  *See* Pl.'s Mem. Supp. MSJ at 30 ("Although [he] did not point out specific harm, the May 2013 EER reviewer described how serving in a function that was split between two posts was disadvantageous.").  Furthermore, the plaintiff does not dispute that he received 45 weeks of Arabic language training, *see* AR at 8 n.1, which typically allows an officer to achieve the Speaking-2/Reading-2 level of Arabic proficiency, *see* Answer ¶ 21, ECF No. 9 ("Generally, members of the Foreign Service are expected to train between . . . 44 weeks to reach the Speaking-2/Reading-2 level of Arabic.").  The record suggests that a "specific objective[]" for plaintiff was to "[r]each 2 (reading)/2 (speaking) level in Arabic."  AR at 33.  This objective should have been attainable based on 45 weeks of training, and the plaintiff has introduced no evidence to suggest that more training was required.

[21] The plaintiff seeks as relief an order from this Court that, among other things, would order (1) removal of the May and November 2013 EERs from the plaintiff's personnel file, (2) rescission of the tenure decisions predicated on those EERs, and (3) reinstatement of the plaintiff's employment, with back pay and benefits.  "[W]hen a court reviewing agency action determines that an agency made an error of law," however, "the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Industries, Inc. v. United States*, 522 F.3d 363, 365 (D.C. Cir. 1995).  Accordingly, the proper remedy is to remand this action to the FSGB for further proceedings.